**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| 2101 Webster Street, Suite 1300 | ) | |
| Oakland, CA 94612, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civ. No. _____ |
| v. | ) | |
| | ) | |
| GINA MCCARTHY, | ) | |
| in her official capacity as Administrator, | ) | |
| U.S. Environmental Protection Agency, | ) | |
| 1200 Pennsylvania Avenue, N.W. | ) | |
| Washington, DC 20460, | ) | |
| | ) | |
| Defendant. | ) | |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**INTRODUCTION**

1.      With this action, Plaintiff Sierra Club seeks to compel the Administrator of the United States Environmental Protection Agency ("Administrator" or "EPA") to respond to two petitions to object to the proposed operating permits for two coal-fired power plants in North Carolina, which both are causing dangerous sulfur dioxide pollution in surrounding communities—Duke Energy's Asheville Steam Electric Plant ("Asheville Plant") and Roxboro Steam Electric Plant ("Roxboro Plant").  *See* 42 U.S.C. § 7661d(b)(2).  The Clean Air Act imposes upon the EPA Administrator a non-discretionary duty to grant or deny such petitions within sixty days of their filing.  *Id*.

2.      Sierra Club filed a petition on June 17, 2016 ("Asheville Petition"), asking EPA to object to the operating permit ("Asheville Permit") issued by the Western North Carolina

Regional Air Quality Agency ("WNCRAQA") under Title V of the Clean Air Act for the

Asheville Plant.  On June 23, 2016, Sierra Club filed a separate petition ("Roxboro Petition")

asking EPA to object to the operating permit ("Roxboro Permit") issued by the North Carolina

Department of Environmental Quality ("DEQ") under Title V of the Clean Air Act for the

Roxboro Plant.

3.     More than sixty days have passed since the filing of Sierra Club's Asheville and

Roxboro Petitions.  Nevertheless, EPA has not granted or denied the petitions, in contravention

of the mandatory, sixty-day deadline for such action.  *Id*.  The Administrator, therefore, has

violated and continues to violate her nondiscretionary duties under the Clean Air Act.

4.     Accordingly, Sierra Club seeks a declaration that the Administrator is in violation

of the Clean Air Act and an order compelling the Administrator to grant or deny Sierra Club's

Asheville and Roxboro Petitions no later than sixty days after such order.

## JURISDICTION

5.     The instant action arises under the Clean Air Act.  42 U.S.C. § 7661d(b).  This

Court has jurisdiction over Sierra Club's claims pursuant to 42 U.S.C. § 7604(a) and 28 U.S.C.

§§ 1331, 1361.  This Court has authority to order declaratory and injunctive relief pursuant to

42 U.S.C. § 7604 and 28 U.S.C. §§ 1361, 2201, and 2202.

## NOTICE

6.     By certified letters dated August 25, 2016, Sierra Club provided the Defendant

with written notice of the Administrator's failure to perform her nondiscretionary duties at issue

in this case and of its intent to bring this action, as required by 42 U.S.C. § 7604(b) and

40 C.F.R. §§ 54.2, 54.3.  *See* Exhibits 1 (Letter from Kathryn Amirpashaie, counsel for Plaintiff,

to Gina McCarthy, Administrator of the EPA, re Asheville Petition (Aug. 25, 2016)) and 2

(Letter from Kathryn Amirpashaie, counsel for Plaintiff, to Gina McCarthy, Administrator of the EPA, re Roxboro Petition (Aug. 25, 2016)).  A period of sixty days has elapsed since EPA was notified of Sierra Club's claims and intent to file suit, therefore, notice was proper.  *See* 42 U.S.C. § 7604(b)(2).

## VENUE

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(e)(1). A substantial part of the events or omissions giving rise to Sierra Club's claims occurred in the District of Columbia.  Defendant Administrator McCarthy is an officer of the United States, sued for acts and omissions in her official capacity, and her official residence is in the District of Columbia.  In addition, EPA has its principal office in the District of Columbia.

## PARTIES

8.      Plaintiff Sierra Club is the oldest and largest grassroots environmental organization in the United States, with over 640,000 members nationally, including nearly 16,000 members in North Carolina.  Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.  Sierra Club and its members are greatly concerned about the effects of air pollution on the environment and human health and have a long history of involvement in activities related to air quality and source permitting under the Clean Air Act.

9.      Sierra Club is a "person" within the meaning of 42 U.S.C. § 7602(e).  As such, Sierra Club may commence a civil action under 42 U.S.C. § 7604(a).

10.      EPA's failure to perform the mandatory duties described in this Complaint has

injured and continues to injure the health, recreational, environmental, organizational, and procedural interests of Sierra Club and its members.

11.     Sierra Club members live, raise their families, work, recreate, and conduct educational, advocacy, and other activities in areas where they are exposed to dangerous air pollutants emitted from the Asheville and Roxboro Plants.  Such air pollutants, which include sulfur dioxide, are associated with a variety of adverse effects on human health and damage to wildlife and vegetation, thereby threatening the health of Sierra Club members and their use and enjoyment of the air, environment, wildlife, and scenery adversely impacted by such pollutants.

12.     EPA's failure to respond to Sierra Club's Petitions causes harm by creating doubt and concern for Sierra Club members about whether the Asheville and Roxboro Permits are operating in compliance with the requirements of the Clean Air Act and about whether they and their families are being exposed to unsafe concentrations of sulfur dioxide.

13.     EPA's failure to respond to Sierra Club's Petitions also causes harm by depriving Sierra Club and its members of protections to which they are entitled under the Clean Air Act and their procedural right to a timely decision on the Petitions.

14.     EPA's failure to act prevents Sierra Club and its members from challenging unfavorable EPA decisions or benefiting from favorable decisions on the Petitions.

15.     Granting the relief requested in this lawsuit would redress Sierra Club's injuries.

16.     Gina McCarthy is sued in her official capacity as the Administrator of the EPA. She is responsible for taking various actions to implement and enforce the Clean Air Act, including the mandatory duty at issue in this case.

## **LEGAL BACKGROUND**

17.     The core purpose of the Clean Air Act is the protection of public health against

4

the effects of harmful air pollution.  *See* 42 U.S.C. § 7401(b)(1).  Consistent with this goal, the

Act requires EPA to establish health-based National Ambient Air Quality Standards ("NAAQS")

for certain pollutants, including sulfur dioxide, set at a level adequate to protect the public from

the harmful effects of exposure to those pollutants.  *See* 42. U.S.C. § 7409(b)(1).

18.     In recognition of the serious public health threat posed by exposure to sulfur

dioxide, EPA has established NAAQS for sulfur dioxide, first in 1971, *see* U.S. EPA, Final Rule,

National Primary and Secondary Ambient Air Quality Standards, 36 Fed. Reg. 8186 (April 30,

1971), and again in 2010, when the Agency revoked and replaced the 1971 standard.  *See* U.S.

EPA, Final Rule, Primary National Ambient Air Quality Standard for Sulfur Dioxide, 75 Fed.

Reg. 35,520, 35,525 (June 22, 2010) (codified at 40 C.F.R. § 50.17(a)) (setting a one-hour

standard of 75 parts per billion ("ppb")).

19.     North Carolina DEQ and WNCRAQA have adopted the 2010 standard for sulfur

dioxide.  *See* 15A N.C.A.C. § 2D.0402(d) ("The primary one-hour annual ambient air quality

standard for oxides of sulfur is 75 parts per billion." ); WNCRAQA Code § 4.0402(d) (same).

20.     State and regional air quality agencies that are delegated implementation authority

under the Clean Air Act must develop and implement plans that include "applicable

requirements," 40 C.F.R. § 70.2(1), the compliance with which advances attainment of the

federal NAAQS and other standards.  These applicable requirements are executed with respect to

individual facilities through permitting programs established under Title V of the Act.  *See*

42 U.S.C. §§ 7410, 7661.

21.     Major stationary sources of air pollution cannot operate except in compliance

with an operating permit issued pursuant to Title V of the Clean Air Act, 42 U.S.C. § 7661a(a),

and such permits "shall include enforceable emission limitations and standards . . . and such

other conditions as are necessary to assure compliance with applicable requirements of this

chapter, including the requirements of the applicable implementation plan," 42 U.S.C. §

7661c(a); *see also* 40 C.F.R. § 70.6(a)(1).

22.     EPA delegated to DEQ the authority to administer the Clean Air Act's Title V

operating permit program in North Carolina, and to WNCRAQA the authority to administer the

program in Buncombe County and the City of Asheville.  *See* Clean Air Act Final Full Approval

of Operating Permit Programs; North Carolina, Mecklenburg County, and Western North

Carolina, 66 Fed. Reg. 45,941 (Aug. 31, 2001)*; see also* N.C.G.S. § 143-215.112.

23.     DEQ and WNCRAQA must issue Title V permits for individual facilities that

include enforceable emission limitations and standards necessary to assure those facilities'

compliance with all applicable requirements.  42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6(a)(1).

24.     Both the North Carolina and WNCRAQA implementation plans include

applicable requirements expressly prohibiting air pollution sources from causing the exceedance

of an ambient air quality standard and affirmatively requiring permit conditions to prevent such

pollution.  Specifically, both North Carolina and WNCRAQA regulations provide that: "No

facility or source of air pollution shall cause any ambient air quality standard in this Section to be

exceeded or contribute to a violation of any ambient air quality standard in this Section."

15A N.C.A.C. § 2D.0401(c); WNCRAQA Code § 4.0401(c) (emphasis added).

25.     In addition, the "Emission Control Standards" of North Carolina's and

WNCRAQA's regulations require that: "In addition to any control or manner of operation

necessary to meet emission standards in this Section, any source of air pollution shall be operated

with such control or in such manner that the source shall not cause the ambient air quality

standards of Section .0400 of this Chapter to be exceeded at any point beyond the premises on

which the source is located."  15A N.C.A.C. § 2D.0501(c); WNCRAQA Code § 4.0501(c).

26.     Those regulations, which represent a specific strategy by North Carolina for ensuring clean air, further require that: "When controls more stringent than named in the applicable emission standards in this Section are required to prevent violation of the ambient air quality standards or are required to create an offset, the permit shall contain a condition requiring these controls."  *Id*.

27.     Before DEQ or WNCRAQA may issue, renew, or significantly modify a Title V permit, the permitting authority must send the proposed Title V permit to EPA for review. 42 U.S.C. § 7661d(a)(1).  EPA then has forty-five days to review the proposed permit. 42 U.S.C. § 7661d(b).  EPA must object to the issuance of the permit if EPA finds that the permit does not comply with all applicable requirements under the Clean Air Act.  *Id*.

28.     If the Administrator does not object in writing to the issuance of a proposed permit on her own accord, any person may, within sixty days after the expiration of EPA's review period, petition the Administrator to take such action.  42 U.S.C. § 7661d(b)(2).

29.     The Clean Air Act sets a mandatory deadline by which EPA must respond to any such petition, requiring that the Administrator "shall grant or deny such petition within 60 days after the petition is filed."  *Id*.

30.     If EPA objects to a permit, the permitting authority may not issue the permit unless it is revised.  42 U.S.C. § 7661d(b)(3).  If the permitting authority has issued a permit prior to receipt of an objection by the Administrator, the Administrator shall modify, terminate, or revoke such permit.  *Id*.

31.     If EPA fails to comply with a non-discretionary duty, such as acting on a petition to object within the statutorily mandated sixty-day timeframe, the Clean Air Act allows any

person to bring suit to compel EPA to perform its duty.  *See* 42 U.S.C. § 7604(a).

## FACTUAL BACKGROUND

**A.      Sulfur Dioxide Pollution from Duke Energy's Asheville Plant**

32.      Duke Energy owns and operates the half-century old, coal-burning power plant just south of the City of Asheville in Buncombe County, North Carolina.  The Asheville Plant, which includes two coal-fired electric generating units, is a major stationary source of air pollution and subject to Title V of the Clean Air Act.

33.      Despite being equipped with ratepayer-funded pollution control technology—*i.e.*, flue gas desulfurization systems or "scrubbers"—the Asheville Plant remains a significant source of sulfur dioxide and, in recent years, the Plant's sulfur dioxide emission rates have increased.

34.      Data reported by Duke Energy show that it has not been operating the Asheville Plant's scrubbers at their maximum demonstrated efficiency and that it has been burning coal with higher sulfur content.

35.      Air dispersion modeling has demonstrated that on one out of every three to four days between 2010 and 2014, emissions from the Asheville Plant caused downwind ambient sulfur dioxide concentrations higher than the 75-ppb health-based standard—on some days, nearly three and a half times higher.

**B.      WNCRAQA's Proposed Title V Permit for the Asheville Plant**

36.      On March 26, 2015, WNCRAQA issued a draft Title V renewal permit for the Asheville Plant (Permit No. 11-628-15).

37.      Sierra Club members were among the hundreds of Asheville residents who attended an April 29, 2015 public hearing on the draft permit.  Public testimony at the hearing was nearly uniform in support of a revised permit with numerical limits on sulfur dioxide

emissions that would allow the community to monitor and enforce compliance with the permit and the requirement that the Asheville Plant not cause any exceedance of governing ambient air quality standards.

38.     On April 30, 2015, Sierra Club submitted timely comments on the Asheville Permit, along with sulfur dioxide air dispersion modeling results, and subsequently shared those comments with EPA.

39.     On April 15, 2016, WNCRAQA submitted a revised proposed Title V permit for the Asheville Plant to EPA for review.  The proposed permit included revised numerical emission limits for sulfur dioxide based on air dispersion modeling, but only stringent enough to ensure that the Asheville Plant will not cause exceedances of the 1971 air quality standard for sulfur dioxide—the very standard that EPA revoked as not being protective of human health and that EPA replaced in 2010 with the 75-ppb standard.

40.     EPA's forty-five day review period for the Asheville Permit ended on May 30, 2016.  EPA did not object to the proposed Tile V permit in writing.

**C.     Sulfur Dioxide Pollution from Duke Energy's Roxboro Plant**

41.     Duke Energy also owns and operates another half-century old, coal-burning power plant northwest of the City of Roxboro in Person County, North Carolina.  The Roxboro Plant, which includes four coal-fired electric generating units, is a major stationary source of air pollution and subject to Title V of the Clean Air Act.

42.     Like the Asheville Plant, the Roxboro Plant is equipped with ratepayer-funded scrubbers, yet it also remains a significant source of sulfur dioxide and, in recent years, the Plant's sulfur dioxide emission rates have increased.

43.     Data reported by Duke Energy show that it has not been operating the Roxboro

Plant's scrubbers at their maximum demonstrated efficiency and that it has been burning coal with higher sulfur content.

44.     Air dispersion modeling has demonstrated that on one out of every three days between 2012 and 2015, emissions from the Roxboro Plant caused downwind ambient sulfur dioxide concentrations higher than the 75-ppb standard—on some days, nearly three times higher.

**D.     DEQ's Proposed Title V Permit for the Roxboro Plant**

45.     On April 4, 2016, DEQ issued a draft Title V permit for the Roxboro Plant (Permit No. 01001T49) that retained the existing numerical emission limits for sulfur dioxide that were set to ensure compliance with the obsolete 1971 NAAQS that was revoked and replaced in 2010 with the 75-ppb standard.

46.     On May 4, 2016, Sierra Club submitted timely comments on the Roxboro Permit, along with sulfur dioxide air dispersion modeling results, and shared those comments with EPA. Sierra Club's comments urged DEQ to issue a revised permit with numerical limits on sulfur dioxide emissions that would allow the surrounding community to monitor and enforce compliance with the permit and the requirement that the Roxboro Plant not cause any exceedance of governing ambient air quality standards.

47.     DEQ submitted the Roxboro Plant's proposed Title V permit to EPA for review; EPA's forty-five day review period for the Roxboro Permit began on April 4, 2016 and ended on May 19, 2016.  EPA did not object to the proposed Title V permit in writing.

**E.      Sierra Club's Petitions to Object to the Asheville and Roxboro Title V Permits**

48.     On June 17, 2016, Sierra Club filed a petition requesting that the Administrator object to the issuance of the Asheville Plant's Title V operating permit because the permit fails to impose conditions that ensure compliance with applicable requirements under the Clean Air Act.

49.     On June 23, 2016, Sierra Club filed a petition requesting that the Administrator object to the issuance of the Roxboro Plant's Title V operating permit because the permit fails to impose conditions that ensure compliance with applicable requirements under the Clean Air Act.

50.     The Asheville and Roxboro Petitions were timely filed within sixty days of the conclusion of EPA's respective forty-five day review periods.

51.     Sierra Club's Asheville and Roxboro Petitions are based on objections that were raised with reasonable specificity during the public comment periods for the permits, in accordance with 42 U.S.C. § 7661d(b)(2).  Specifically, Sierra Club seeks objection by EPA because the permits lack numerical limits on the emission of sulfur dioxide stringent enough to ensure that the governing ambient air quality standard will not be exceeded downwind of the plants.  The Asheville and Roxboro Petitions present a narrow question of law for the Agency's consideration: Where the express terms of a state or local Clean Air Act implementation plan prohibit air pollution sources from causing the exceedance of a governing ambient air quality standard, must an operating permit include conditions specifically tailored to ensure that the source will not cause such exceedances?

52.     EPA had sixty days, until August 16, 2016, to grant or deny Sierra Club's Asheville Petition.  42 U.S.C. § 7661d(b)(2).

53.     EPA had sixty days, until August 22, 2016, to grant or deny Sierra Club's Roxboro Petition.  42 U.S.C. § 7661d(b)(2).

54.     As of the date of filing of this Complaint, EPA has not yet granted or denied the Asheville or Roxboro Petitions or given Sierra Club any indication that it intends to do so.

## CAUSES OF ACTION

### FIRST CLAIM FOR RELIEF
### VIOLATION OF 42 U.S.C. § 7661d(b)(2)
### (Failure to Grant or Deny Petition to Object to Title V Permit for Asheville Plant)

55.     Sierra Club incorporates the allegations in all preceding paragraphs of this Complaint as if set forth in full herein.

56.     The Administrator had a mandatory duty to grant or deny Sierra Club's Asheville Petition within sixty days after filing.  42 U.S.C. § 7661d(b)(2) ("The Administrator shall grant or deny such petition within 60 days after the petition is filed").

57.     More than sixty days have passed since Sierra Club filed its June 17, 2016 Asheville Petition requesting that EPA object to the Title V Permit for the Asheville Plant.

58.     As of the filing of this Complaint, the Administrator has not granted or denied Sierra Club's Asheville Petition.

59.     Thus, the Administrator has violated and continues to violate the Clean Air Act.

60.     This Clean Air Act violation constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of the Clean Air Act's citizen suit provision.  42 U.S.C. § 7604(a).  The Administrator's violation is ongoing and will continue unless remedied by this Court.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF 42 U.S.C. § 7661d(b)(2)**

**(Failure to Grant or Deny Petition to Object to Title V Permit for Roxboro Plant)**

61.     Sierra Club incorporates the allegations in all preceding paragraphs of this Complaint as if set forth in full herein.

62.     The Administrator had a mandatory duty to grant or deny Sierra Club's Roxboro Petition within sixty days after filing.  42 U.S.C. § 7661d(b)(2) ("The Administrator shall grant or deny such petition within 60 days after the petition is filed").

63.     More than sixty days have passed since Sierra Club filed its June 23, 2016 Roxboro Petition requesting that EPA object to the Title V Permit for the Roxboro Plant.

64.     As of the filing of this Complaint, the Administrator has neither granted nor denied the Roxboro Petition.

65.     Thus, the Administrator has violated and continues to violate the Clean Air Act.

66.     This Clean Air Act violation constitutes a "failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator" within the meaning of the Clean Air Act's citizen suit provision.  42 U.S.C. § 7604(a).  The Administrator's violation is ongoing and will continue unless remedied by this Court.

**REQUEST FOR RELIEF**

WHEREFORE, Sierra Club respectfully requests this Court enter judgment providing the following relief:

A)     A declaration that the Administrator has violated the Clean Air Act by failing to grant or deny Sierra Club's Asheville and Roxboro Petitions requesting that EPA object to the Title V operating permits for the Asheville and Roxboro Plants;

B)     An order compelling the Administrator to perform her mandatory duties to grant

or deny Sierra Club's Asheville and Roxboro Petitions seeking objection to the Title V operating permits for the Plants by a date certain;

C)      An order retaining jurisdiction over this matter until such time as the Administrator has performed her non-discretionary duties under the Clean Air Act;

D)      An order awarding Sierra Club its costs of litigation, including reasonable attorneys' fees; and

E)      Such other and further relief as the Court deems just and proper.


Respectfully submitted,


Dated: November 10, 2016             */s/ Kathryn Amirpashaie*

KATHRYN M. AMIRPASHAIE
DC Bar Id. No. 1001491
Law Office of Kathryn M. Amirpashaie, PLC
406 Blue Ridge Avenue NE
Leesburg, VA 20176
703-771-8394
kmalawoffice@gmail.com


*Counsel for Plaintiff Sierra Club*