**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SIERRA CLUB, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 16-cv-02238-ESH |
| v. | ) | |
| | ) | |
| GINA MCCARTHY, | ) | |
| in her official capacity as Administrator, | ) | |
| U.S. Environmental Protection Agency, | ) | |
| | ) | |
| Defendant. | ) | |

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR EXPEDITED SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................III

INTRODUCTION ..............................................................................................................1

STATEMENT OF THE ISSUE..........................................................................................2

BACKGROUND ................................................................................................................ 3

I.       STATUTORY AND REGULATORY FRAMEWORK .....................................3

         A.   EPA Set the Minimum National Ambient Air Quality Standard for Sulfur
              Dioxide at 75 Parts per Billion in Order to Protect Public Health..........................3

         B.   Title V Permit Conditions Must Assure that Sources of Air Pollution
              Comply with All Applicable Requirements under the Clean Air Act. ...................4

         C.   North Carolina and WNCRAQA Implementation Plans Include
              Applicable Requirements that Prohibit Exceedance of the 75-ppb Sulfur
              Dioxide Ambient Air Quality Standard. ................................................................5

         D.   EPA Has Reaffirmed the Need for Title V Permits to Include Conditions
              that Are Specifically Tailored to Assure Compliance with Applicable
              Requirements that Prohibit Exceedance of Ambient Air Quality Standards...........7

         E.   The Clean Air Act Requires EPA to Review All Proposed Title V Permits
              Issued by a Delegated Permitting Authority and to Respond to Any
              Petitions to Object to those Permits within Sixty Days. .........................................8

II.      FACTUAL BACKGROUND .............................................................................8

         A.   Emissions from Duke Energy's Asheville Plant Cause Unsafe Sulfur
              Dioxide Pollution in Communities Downwind of the Plant. ...................................9

         B.   WNCRAQA's Proposed Permit for the Asheville Plant Fails to Include a
              Numerical Limit on the Emission of Sulfur Dioxide Stringent Enough to
              Ensure Compliance with Applicable Requirements. ............................................10

         C.   Emissions from Duke Energy's Roxboro Plant Cause Unsafe Sulfur
              Dioxide Pollution in Communities Downwind of the Plant. .................................11

         D.   DEQ's Proposed Permit for the Roxboro Plant Fails to Include a
              Numerical Limit on the Emission of Sulfur Dioxide Stringent Enough to
              Ensure Compliance with Applicable Requirements. ............................................12

         E.   The Administrator Has Taken No Action on Either of Sierra Club's
              Petitions to Object.................................................................................................13

STANDING ....................................................................................................................................14

STANDARD OF REVIEW ...........................................................................................................18

ARGUMENT .................................................................................................................................19

I.      THIS COURT HAS JURISDICTION TO COMPEL EPA TO COMPLY WITH
        THE CLEAN AIR ACT......................................................................................................19

II.     EPA VIOLATED THE CLEAN AIR ACT BY FAILING TO DISCHARGE ITS
        NON-DISCRETIONARY DUTY TO GRANT OR DENY SIERRA CLUB'S
        PETITIONS WITHIN SIXTY DAYS OF THEIR SUBMISSION...................................19

III.    AN ORDER COMPELLING EPA TO GRANT OR DENY THE PETITIONS
        WITHIN THIRTY DAYS IS WARRANTED. ..................................................................20

CONCLUSION..............................................................................................................................22

# TABLE OF AUTHORITIES

CASES                                                                    PAGE(S)

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)...................................................................................................18

*Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*,
    686 F. Supp. 2d 663 (E.D. La. 2010) ....................................................................18

*Confederated Tribes of Grand Ronde Community of Oregon v. Jewell*,
    75 F. Supp. 3d 387 (D.D.C. 2014) .........................................................................17

*Defenders of Wildlife v. Gutierrez*,
    532 F.3d 913 (D.C. Cir. 2008) ...............................................................................14

*Environmental Defense v. Leavitt*,
    329 F. Supp. 2d. 55 (D.D.C. 2004) ........................................................................19

*Friends of Animals v. Salazar*,
    626 F. Supp. 2d 102 (D.D.C. 2009) .......................................................................14

*Friends of the Earth v. Laidlaw*,
    528 U.S. 167 (2000)...................................................................................14, 15, 18

*Hunt v. Washington State Apple Advertising Commission*,
    432 U.S. 333 (1977)...............................................................................................15

*LaFleur v. Whitman*,
    300 F.3d 256 (2nd Cir. 2002)................................................................................17

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992)...............................................................................................14

*Maydak v. United States*,
    630 F.3d 166 (D.C. Cir. 2010) ...............................................................................18

*National Parks Conservation Association. v. Manson*,
    414 F.3d 1 (D.C. Cir. 2005)...................................................................................14

*Natural Resources Defense Council v. EPA*,
    489 F.3d 1364 (D.C. Cir. 2007) .............................................................................14

*Natural Resources Defense Council v. Illinois Power Resources*,
    --- F. Supp. 3d ----, 2016 WL 4468552 (C.D. Ill. Aug. 23, 2016).....................17, 18

*Natural Resources Defense Council v. Ruckelshaus*,
    1984 WL 6092 (D.D.C. 1987) ....................................................................20, 21 n.4

*Sierra Club v. Franklin County Power*,
    546 F.3d 918 (7th Cir. 2008) ...............................................................17

*Sierra Club v. Johnson*,
    444 F. Supp. 2d 46 (D.D.C. 2006) ..................................................21, 22

*St. Bernard Citizens for Environmental Quality, Inc. v. Chalmette Refining*,
    354 F. Supp. 2d 697 (E.D. La. 2005) ....................................................18

*State of New York v. Gorsuch*,
    554 F. Supp. 1060 (S.D.N.Y. 1983) .......................................................22

*Sugar Cane Growers Co-op of Florida v. Veneman*,
    289 F.3d 89 (D.C. Cir. 2002) ................................................................14

*United States v. SCRAP*,
    412 U.S. 669 (1973) ..............................................................................17

## FEDERAL STATUTES

42 U.S.C. § 7410 ...........................................................................................5

42 U.S.C. § 7604(a) ............................................................................19, 20

42 U.S.C. § 7604(a)(2) ...........................................................................3, 19

42 U.S.C. § 7661 ...........................................................................................5

42 U.S.C. § 7661a .........................................................................................5

42 U.S.C. § 7661a(a) ....................................................................................4

42 U.S.C. § 7661c(a) .................................................................................4, 6

42 U.S.C. § 7661d(a)(1) ...............................................................................8

42 U.S.C. § 7661d(b)(1) .........................................................................8, 13

42 U.S.C. § 7661d(b)(2) .........................................................1–3, 8, 19, 20

## REGULTAIONS AND FEDERAL REGISTER ENTRIES

40 C.F.R. § 50.17(a) .....................................................................................3

40 C.F.R. § 70.2(1) .......................................................................................5

40 C.F.R. § 70.6(a)(1) ...............................................................................4, 6

Fed. R. Civ. P. 56(a) ..................................................................................18

Fed. R. Civ. P. 56(c)(1)(A) ...................................................................................................18

36 Fed. Reg. 8186 ..................................................................................................................3

57 Fed. Reg. 32,250 ...............................................................................................................4

66 Fed. Reg. 45,941 ...............................................................................................................5

75 Fed. Reg. 35,520 ...............................................................................................3, 9 n.2, 15

15A N.C.A.C. § 2D.0401(c) ..................................................................................................6

15A N.C.A.C. § 2D.0402(d) ..................................................................................................4

15A N.C.A.C. § 2D.0501(c) ...............................................................................................6, 7

15A N.C.A.C. § 2Q.0500 .......................................................................................................5

WNCRAQA Code § 4.0401(c) ..............................................................................................6

WNCRAQA Code § 4.0402(d) ..............................................................................................4

WNCRAQA Code § 4.0501(c) ..............................................................................................6

WNCRAQA Code § 17.0500 .................................................................................................5

## INTRODUCTION

Defendant United States Environmental Protection Agency ("EPA") has violated the Clean Air Act by failing to act on two petitions to object ("Petitions") to the proposed operating permits ("Proposed Permits") for two coal-fired power plants in North Carolina—Duke Energy's Asheville Steam Electric Plant ("Asheville Plant") and Roxboro Steam Electric Plant ("Roxboro Plant"). The Clean Air Act imposes upon the EPA Administrator a non-discretionary duty to grant or deny such petitions within sixty days of their filing. 42 U.S.C. § 7661d(b)(2). There can be no dispute regarding liability, as EPA has not acted on the Petitions within sixty days of Plaintiff Sierra Club filing them. Thus, the only question before the Court is one of remedy: By when must EPA respond to the Petitions?

Sierra Club urges the Court to act with haste and to order EPA to grant or deny the Petitions within thirty days. The Petitions present a simple legal issue that the Administrator has already decided: Where the express terms of a state or local Clean Air Act implementation plan prohibit air pollution sources from causing the exceedance of a governing ambient air quality standard, must an operating permit include conditions specifically tailored to ensure that the source will not cause such exceedance? The Administrator addressed this question in 2014 in response to another petition to object filed by Sierra Club. In that case, the Administrator objected to an operating permit that included emission limits that were too lenient and, thus, failed to ensure that a New Hampshire facility would not cause downwind exceedances of ambient air quality standards.

In the Petitions at issue here, Sierra Club is simply requesting EPA to apply the past legal precedent from New Hampshire to North Carolina. The Petitions do not require any evaluation of facts or any technical determination. Given the lack of factual dispute and the Administrator's

prior ruling on the legal question at hand, it is difficult to characterize EPA's inaction here as anything other than agency foot-dragging.

Meanwhile, the need for swift action is clear. Undisputed air dispersion modeling of Duke Energy's emissions demonstrates that on approximately one out of every three to four days the families living near the Asheville and Roxboro Plants are being exposed to levels of sulfur dioxide that EPA itself has deemed unsafe. Sierra Club shared the modeling results with the permitting agencies and EPA and has since been urging the agencies to take action to alleviate the unsafe air conditions. In June 2016, Sierra Club submitted its Petitions to Object, formally seeking action by EPA on the Proposed Permits. It is now well beyond sixty days since the filing of those Petitions, the Asheville and Roxboro Plants continue to emit sulfur dioxide at rates that cause significant downwind exceedances of the governing air quality standard, and EPA still has taken no action.

In light of the Administrator's ongoing failure to perform her non-discretionary duty to either grant or deny Sierra Club's Petitions to Object in accordance with 42 U.S.C. § 7661d(b)(2), Sierra Club moves for summary judgment and seeks a declaration that the Administrator has violated the Clean Air Act. Further, given the clear threat to public health, EPA's long awareness of that threat, and the Administrator's prior decision on the legal question raised in the Petitions, Sierra Club seeks an order compelling EPA's grant or denial of the Petitions within thirty days of the Court's ruling on this motion and respectfully requests that the Court expedite its consideration of the motion.

## STATEMENT OF THE ISSUE

Where the Clean Air Act mandates that the EPA Administrator shall grant or deny a petition to object to a proposed state operating permit within sixty days after such petition is filed, and where EPA failed to respond to a petition to object within sixty days and this failure is

2

continuing, is EPA liable for "a failure of the Administrator to perform an act or duty under the

Clean Air Act that is not discretionary with the Administrator" under 42 U.S.C. § 7604(a)(2)?

## BACKGROUND

### I.      Statutory and Regulatory Framework

Section 505 of the Clean Air Act makes very clear the Administrator's obligation to

respond to petitions to object within sixty days of their filing: "[t]he Administrator shall grant or

deny such petition within 60 days after the petition is filed."  42 U.S.C. § 7661d(b)(2).  Other

sections of the Clean Air Act and its implementing regulations provide useful context for the

question of remedy in this case—particularly with respect to the simplicity of the issue presented

in Sierra Club's Petitions—and are discussed below.

### A.      EPA Set the Minimum National Ambient Air Quality Standard for Sulfur Dioxide at 75 Parts per Billion in Order to Protect Public Health.

EPA concluded decades ago that sulfur dioxide can adversely affect both human health

and the environment and, to protect against such adverse impacts, established ambient air quality

standards for sulfur dioxide in 1971.  U.S. EPA, Final Rule, National Primary and Secondary

Ambient Air Quality Standards, 36 Fed. Reg. 8186 (April 30, 1971).  In June 2010, after

reviewing the latest medical and scientific evidence, EPA determined that exposure to sulfur

dioxide for even very short periods of time—such as five minutes—and at much lower levels

than previously understood, causes decrements in lung function, aggravation of asthma, and

respiratory and cardiovascular morbidity.  U.S. EPA, Final Rule, Primary National Ambient Air

Quality Standard for Sulfur Dioxide, 75 Fed. Reg. 35,520, 35,525 (June 22, 2010).  In order to

protect the public against such adverse effects, EPA lowered the previous standard for sulfur

dioxide to a one-hour standard set at 75 parts per billion ("ppb").  *See* 40 C.F.R. § 50.17(a).

Following EPA's promulgation of the updated 75-ppb air quality standard, both the North

Carolina Department of Environmental Quality ("DEQ") and the Western North Carolina

Regional Air Quality Agency ("WNCRAQA") revised their regulations to include the new sulfur

dioxide standard in 2011.  *See* 15A N.C.A.C. § 2D.0402(d) ("The primary one-hour annual

ambient air quality standard for oxides of sulfur is 75 parts per billion." ); WNCRAQA Code

§ 4.0402(d) (same).  Accordingly, North Carolina's ambient air quality standards for sulfur

dioxide are in alignment with the federal standard.

### B.     Title V Permit Conditions Must Assure that Sources of Air Pollution Comply with All Applicable Requirements under the Clean Air Act.

Major stationary sources of air pollution cannot operate except in compliance with

operating permits issued pursuant to Title V of the Clean Air Act.  42 U.S.C. § 7661a(a).  Such

Title V permits "shall include enforceable emission limitations and standards . . . and such other

conditions as are necessary to assure compliance with applicable requirements of [the Clean Air

Act], including the requirements of the applicable implementation plan."  42 U.S.C. § 7661c(a);

*see also* 40 C.F.R. § 70.6(a)(1) (requiring that all Title V permits contain all "those operational

requirements and limitations that assure compliance with all applicable requirements at the time

of permit issuance").  In short, applicable requirements are the regulations that lay out the rules

for complying with the Clean Air Act, and the Title V permit program applies those rules

through facility-specific permit conditions.

As EPA explained in the preamble to its Title V permit program rule, in addition to

applying the applicable requirements to a given facility, the Title V permit program was created

to ensure that a major stationary source's operating requirements are clear and that the source's

compliance with those requirements is likewise clear, so that the public can monitor and enforce

compliance.  *See* U.S. EPA, Operating Permit Program, 57 Fed. Reg. 32,250, 32,251 (July 21,

1992) ("The title V permit program will enable the source, States, EPA, and the public to understand better the requirements to which the source is subject, and whether the source is meeting those requirements.  Increased source accountability and better enforcement should result."). "[R]egulations are often written to cover broad source categories," leaving it "unclear which, and how, general regulations apply to a source." *Id.*  Title V permits are intended to bridge this gap by "mak[ing] more readily enforceable a source's pollution control requirements" and "tailor[ing] and clarify[ing] how the general rules apply to the specific source," thus providing an easy way "to establish whether a source is in compliance."  S. Rep. 101-228, 1990 USCAAN 3385, 3730 (Dec. 20, 1989).

       **C.**    **North Carolina and WNCRAQA Implementation Plans Include Applicable Requirements that Prohibit Exceedance of the 75-ppb Sulfur Dioxide Ambient Air Quality Standard.**

      While the Clean Air Act contemplates EPA as the permit issuing authority under the Title V permit program, EPA can delegate that responsibility to the states, as it has done with regard to North Carolina.  *See* 42 U.S.C. § 7661a.  In North Carolina, the agencies that have been delegated this responsibility include DEQ and WNCRAQA.  *See* Clean Air Act Final Full Approval of Operating Permit Programs; North Carolina, Mecklenburg County, and Western North Carolina, 66 Fed. Reg. 45,941 (Aug. 31, 2001); *see also* 15A N.C.A.C. 2Q.0500; WNCRAQA Code § 17.0500.  State and regional air quality agencies to which Title V permitting authority has been delegated must develop and implement regulations, known as state or local implementation plans, that include the "applicable requirements" discussed above. 40 C.F.R. § 70.2(1).  These "applicable requirements" are then applied with respect to individual facilities through enforceable provisions of Title V permits.  *See* 42 U.S.C. §§ 7410, 7661.

      As the agencies with the authority to administer the Clean Air Act's Title V permit program in North Carolina, DEQ and WNCRAQA must issue Title V permits for individual

facilities that include enforceable emission limitations and standards necessary to assure those facilities' compliance with all applicable requirements. 42 U.S.C. § 7661c(a); 40 C.F.R. § 70.6(a)(1). Both the North Carolina and WNCRAQA implementation plans include applicable requirements expressly prohibiting air pollution sources from causing the exceedance of an ambient air quality standard and affirmatively requiring permit conditions to prevent such pollution. Specifically, both North Carolina and WNCRAQA regulations provide that:

> No facility or source of air pollution shall cause *any ambient air quality standard in this Section to be exceeded or contribute to a violation of any ambient air quality standard in this Section.*

15A N.C.A.C. § 2D.0401(c); WNCRAQA Code § 4.0401(c) (emphasis added). In addition, the "Emission Control Standards" of North Carolina's and WNCRAQA's regulations require that:

> In addition to any control or manner of operation necessary to meet emission standards in this Section, any source of air pollution shall be operated with such control or in such manner that the source *shall not cause the ambient air quality standards of Section .0400 of this Chapter to be exceeded at any point beyond the premises on which the source is located.*

15A N.C.A.C. § 2D.0501(c); WNCRAQA Code § 4.0501(c) (emphasis added). Those regulations, which represent a specific strategy by North Carolina for ensuring clean air, further require that:

> When controls more stringent than named in the applicable emission standards in this Section are required *to prevent violation of the ambient air quality standards* or are required to create an offset, *the permit shall contain a condition requiring these controls.*

*Id.* (emphasis added).

In sum, both North Carolina and WNCRAQA regulations explicitly include: (1) an applicable requirement that prohibits causing an exceedance of the governing ambient air quality standard anywhere beyond the premises of an air pollution source; and (2) an applicable requirement that directs the permitting authority to include "a condition" sufficient "to prevent

violation of the ambient air quality standards." *Id.*  Thus, the requirement that DEQ and

WNCRAQA impose numerical emission limits sufficient "to prevent violation of the ambient air

quality standards" is clear.  *See id.*  Indeed, DEQ has recognized the need to translate the

narrative provision of Section 2D.0501(c) into numerical emission limits in its past practice, and

it did so as part of a prior renewal of the Roxboro Plant's Title V permit when it set modeling-

based, numerical limits designed to prevent exceedances of the ambient air quality standard in

force and effect at the time—*i.e.*, the now-revoked 1971 sulfur dioxide standard.  *See* Declaration

of Bridget Lee ("Lee Decl."), Ex. 4, at 9.

    **D.**      **EPA Has Reaffirmed the Need for Title V Permits to Include Conditions that Are Specifically Tailored to Assure Compliance with Applicable Requirements that Prohibit Exceedance of Ambient Air Quality Standards.**

EPA recently reaffirmed, through its response to a similar petition to object, the

requirement that permitting agencies must establish conditions in Title V permits specifically

tailored to assure that permitted facilities will comply with all applicable requirements under the

Clean Air Act.  *See In the Matter of Pub. Serv. of NH*, Order on Petition No. VI-2014-04, 9 (July

28, 2015) ("Title V of the CAA requires that the Proposed Permit must assure compliance with

all applicable requirements, including NH Rule 616").  More specifically, EPA objected to the

Title V permit in question because it failed to apply Rule 616 of New Hampshire's state

implementation plan—a narrative prohibition against violations of the sulfur dioxide air quality

standard in downwind states—through facility-specific permit limits.  *See id.* at 8–11.  The

objected-to permit failed to include modeling-based, numerical emission limits for sulfur dioxide

that were stringent enough to prevent downwind air quality standard exceedances, and, therefore,

the Administrator concluded that the permit and permit record failed to ensure compliance with

all applicable requirements under the Clean Air Act.  *Id.*

**E.      The Clean Air Act Requires EPA to Review All Proposed Title V Permits Issued by a Delegated Permitting Authority and to Respond to Any Petitions to Object to those Permits within Sixty Days.**

Before a state or regional permitting authority may issue, renew, or significantly modify a Title V permit, the permitting authority must forward the application and proposed Title V permit to the EPA Administrator for review.  42 U.S.C. § 7661d(a)(1).  EPA then has forty-five days to review the proposed permit and must object to the issuance of the permit if it finds that the permit does not comply with all applicable provisions under the Clean Air Act.  42 U.S.C. § 7661d(b)(1).  If the Administrator fails to object in writing to the issuance of a proposed permit on her own accord, any person may petition the Administrator within sixty days after the expiration of EPA's forty-five day review period to take such action.  42 U.S.C. § 7661d(b)(2).  Any such petition to object "shall be based only on objections to the permit that were raised with reasonable specificity during the public comment period provided by the permitting agency."  *Id.*  The Clean Air Act sets a mandatory deadline by which EPA must respond to any such petition, requiring that the Administrator "shall grant or deny such petition within 60 days after the petition is filed."  *Id*.

## II.      Factual Background

The undisputed facts that establish EPA's liability are simple: the Administrator failed to respond to Sierra Club's Petitions for the Asheville and Roxboro Plants within the requisite sixty days.[1]  In addition, the facts outlined below give context to Sierra Club's request that the Court order a response by EPA within thirty days.

---

[1] Plaintiff has submitted a Statement of Material Facts as to Which There Is No Genuine Dispute, as required by Local Rule 7(h)(1), with the motion for summary judgment and incorporates that statement by reference herein.

A.    **Emissions from Duke Energy's Asheville Plant Cause Unsafe Sulfur Dioxide Pollution in Communities Downwind of the Plant.**

Duke Energy owns and operates a half-century-old, coal-burning power plant just south of the City of Asheville in Buncombe County, North Carolina.  Despite being equipped with ratepayer-funded pollution control technology—*i.e.*, flue gas desulfurization systems or "scrubbers"—the Asheville Plant remains a significant source of sulfur dioxide and, in recent years, the Plant's sulfur dioxide emission rates have actually increased.  *See* Lee Decl. Ex. 4, at 5–8.  Data reported by Duke Energy show that it has not been operating the Asheville Plant's scrubbers at their maximum demonstrated efficiency and that it has been burning coal with higher sulfur content, resulting in avoidable sulfur dioxide pollution.  *See id.*, at 5–6.

Sierra Club retained a third-party consultant, Air Resources Specialists, to model the impacts of the Asheville Plant on air quality in the surrounding communities given the lack of nearby air quality monitors.[2]  The results were stunning: on *one out of every three to four days* between 2010 and 2014, Duke's sulfur dioxide emissions caused ambient sulfur dioxide concentrations higher than the 75-ppb health-based standard downwind of the Asheville Plant.  *See id.*, at 8.  On some days, the concentrations of sulfur dioxide were nearly *three and a half times higher* than the standard.  *See id.*  During the period modeled, the Plant was emitting sulfur dioxide at rates below the numerical emission limit specified in the permit, yet nonetheless was causing downwind pollution at concentrations higher than the governing ambient air quality standard, demonstrating that the numerical emission limits in the permit are too lenient and not set in accordance with the applicable requirements prohibiting air pollution sources in North

---

[2] Recognizing the "strong source-oriented nature of SO2 ambient impacts," EPA has concluded that air dispersion modeling is "the most technically appropriate, efficient, and readily available method for assessing short-term ambient [sulfur dioxide] concentrations in areas with large point sources" and has explained that "it is more appropriate and efficient to principally use modeling to assess compliance for medium to larger sources."  75 Fed. Reg. at 35,370, 35,551.

Carolina from causing exceedances of a governing ambient air quality standard.

> **B.    WNCRAQA's Proposed Permit for the Asheville Plant Fails to Include a Numerical Limit on the Emission of Sulfur Dioxide Stringent Enough to Ensure Compliance with Applicable Requirements.**

In February 2015, Sierra Club shared the results of the modeling analysis with WNCRAQA, including a specific numerical emission limit needed to prevent further exceedances of the 75-ppb standard by the Asheville Plant. *See id.* Nevertheless, on March 26, 2015, WNCRAQA noticed a draft permit for public comment that ignored those modeling results. *See id.* at 9. Hundreds of Asheville residents attended WNCRAQA's April 29, 2015 hearing on the draft permit and called for a revised permit with tighter numerical limits on sulfur dioxide emissions. *See id.* Pointing again to the modeling analysis, Sierra Club submitted detailed comments on the draft permit, urging WNCRAQA to establish modeling-based, numerical emission limits stringent enough to allow the community to monitor and enforce compliance with the permit and with the requirement that the Plant not cause any exceedance of the 75-ppb standard for sulfur dioxide. *See* Lee Decl. Ex. 1. The results of the modeling analysis were also shared with staff in the Air Permitting Section at EPA Region 4 in April 2015. *See* Lee Decl. ¶ 1.

Nearly a year after the public hearing, WNCRAQA finally sent EPA a revised Proposed Permit for review in April 2016. WNCRAQA did not dispute the validity of the modeling analysis submitted by the Sierra Club, but, instead, set numerical limits based on the results of a modeling analysis designed to ensure compliance with the outdated 1971 air quality standard for sulfur dioxide—the very standard that EPA revoked as not being protective of human health and that EPA replaced in 2010 with the 75-ppb standard. Under the numerical limits in the Proposed Permit, Duke could actually increase the Asheville Plant's sulfur dioxide emission rate by more than triple. *See* Lee Decl. Ex. 4, at 8. Indeed, if the Asheville coal units emit as much sulfur

dioxide as allowed under the numerical limits included in the Proposed Permit, surrounding communities could be exposed daily to sulfur dioxide pollution at concentrations higher than the 75-ppb standard, including, on some days, more than *eighteen times* higher than the standard. *See id*.

### C. Emissions from Duke Energy's Roxboro Plant Cause Unsafe Sulfur Dioxide Pollution in Communities Downwind of the Plant.

Duke Energy's fleet of coal-burning power plants also includes another half-century-old facility, which Duke operates northwest of the City of Roxboro in Person County, near the North Carolina-Virginia border.  Like the Asheville Plant, the Roxboro Plant also is equipped with ratepayer-funded scrubbers, yet it remains a significant source of sulfur dioxide.  *See* Lee Decl. Ex. 6, at 5.  In recent years, the Roxboro Plant's sulfur dioxide emission rates also have increased.  *See id*., at 5–6.  Moreover, data reported by Duke Energy show that it has not been operating the Roxboro Plant's scrubbers at their maximum demonstrated efficiency and has been burning coal with higher sulfur content, resulting in avoidable sulfur dioxide pollution.  *See id*.

As with the Asheville Plant, Sierra Club retained Air Resources Specialists to model the impacts of the Roxboro Plant on air quality in the communities surrounding the Plant.  The results were likewise stunning: on *one out of every three days* between 2012 and 2015, Duke's sulfur dioxide emissions caused ambient sulfur dioxide concentrations higher than the health-based 75-ppb standard downwind of the Roxboro Plant.  *See id*., at 8.  On some days, the concentrations of sulfur dioxide were nearly *three times higher* than the standard.  *See id*.  As with the Asheville Plant, during the period modeled, the Plant was emitting sulfur dioxide at rates below the numerical limit specified in the permit, yet was causing downwind pollution at concentrations higher than the governing ambient air quality standard, demonstrating that the current numerical limit in the Plant's operating permit is insufficiently stringent to ensure

11

compliance with the 75-ppb sulfur dioxide standard.

> **D.    DEQ's Proposed Permit for the Roxboro Plant Fails to Include a Numerical Limit on the Emission of Sulfur Dioxide Stringent Enough to Ensure Compliance with Applicable Requirements.**

In April 2016, DEQ noticed a draft permit for public comment that retained the existing numerical emission limits for sulfur dioxide that had been established before North Carolina's adoption of the 75-ppb standard.  *See id*. at 9.  On May 4, 2016, Sierra Club shared the results of the Roxboro Plant modeling analysis with DEQ and EPA as part of detailed comments urging DEQ to establish modeling-based, numerical emission limits stringent enough to allow the community to monitor and enforce compliance with the permit and the requirement that the Plant not cause any exceedance of the 75-ppb standard for sulfur dioxide.  *See* Lee Decl. ¶ 2.

Despite the evidence of air quality standard exceedances and despite the fact that DEQ did not dispute the modeling analysis results submitted by Sierra Club, DEQ refused to revise the draft permit.  Instead, the numerical emission limits in the Proposed Permit that DEQ sent to EPA for review were set to ensure compliance with the obsolete 1971 ambient air quality standard for sulfur dioxide that has since been revoked and replaced with the 75-ppb standard. Under the numerical limits in the Proposed Permit, Duke could actually increase the Roxboro Plant's sulfur dioxide emission rate by more than double.  *See* Lee Decl. Ex. 6, at 9.  Indeed, if the Roxboro coal units emit as much sulfur dioxide as allowed under the numerical limits included in the Proposed Permit, surrounding communities could be exposed on a daily basis to sulfur dioxide pollution at concentrations higher than the 75-ppb standard, including, on some days, concentrations more than *twenty times* higher than the standard.  *See id*.

**E.** **The Administrator Has Taken No Action on Either of Sierra Club's Petitions to Object.**

EPA's statutorily prescribed forty-five day review period, *see* 42 U.S.C. § 7661d(b)(1), for each Proposed Permit ended without a written objection by the Administrator.  *See* Lee Decl. ¶¶ 3, 5.  Thus, on June 17 and 23, 2016, Sierra Club petitioned the Administrator to object to the issuance of the Proposed Permits for the Asheville Plant and the Roxboro Plant, respectively, for failure to comply with applicable requirements under the Clean Air Act due to the impermissibly lenient proposed numerical limits on sulfur dioxide emissions.  Lee Decl. ¶¶ 4, 6, Exs. 4, 6. More specifically, Sierra Club asked EPA to object because neither Proposed Permit includes numerical limits on the emission of sulfur dioxide stringent enough to ensure that the governing ambient air quality standard would not be exceeded downwind of the Plants, as mandated by the plain language of the applicable requirements in the DEQ and WNCRAQA implementation plans.

Each of Sierra Club's Petitions presents a narrow question of law for EPA's consideration: Must a Title V operating permit include specific permit conditions designed to ensure compliance with narrative applicable requirements that prohibit exceedance of ambient air quality standards?  Despite the clear parallel between the Asheville and Roxboro Petitions and Sierra Club's 2014 petition to object to the New Hampshire plant's permit, which the Administrator granted (not to mention the ongoing public health threat here), EPA has neither granted nor denied Sierra Club's Petitions within the statutorily mandated sixty-day timeframe and, to date, has taken no responsive action whatsoever on the Petitions.  On August 25, 2016, Sierra Club provided EPA with notice of its intent to file suit to compel EPA to respond to the Petitions.  *See* Declaration of Kathryn Amirpashaie ("Amirpashaie Decl.") ¶¶ 2–3, Exs. 1, 2. Even when faced with legal action, EPA has refused to act.  *See id.* ¶¶ 4–5, Ex. 3.

**STANDING**

Sierra Club has standing to bring this action because it and its members have suffered concrete and particularized, actual and imminent injuries, the injuries are fairly traceable to EPA's violation of its statutory duty, and a favorable decision will likely redress these injuries. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992).  The Sierra Club has associational standing to litigate this case on behalf of its members because those members would otherwise have standing to sue in their own right, the interests which Sierra Club seeks to protect in the lawsuit are germane to the purposes of the organization, and neither the claims asserted nor the relief requested requires the participation of individual members in the lawsuit.  *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000); *Natural Res. Def. Council v. EPA*, 489 F.3d 1364, 1370 (D.C. Cir. 2007).

In cases involving procedural injuries, standing requirements are relaxed and courts presume that petitioners will prevail on the merits.  *See Defenders of Wildlife v. Gutierrez*, 532 F.3d 913, 924 (D.C. Cir. 2008) ("[I]n reviewing the standing question, the court must . . . assume that on the merits the plaintiffs would be successful in their claims.") (internal citations omitted); *see also Friends of Animals v. Salazar*, 626 F. Supp. 2d 102, 112 (D.D.C. 2009) (denying the ability to "meaningfully participate" in the "permit process" constituted an informational injury that supported standing).  In such cases, the plaintiff need only demonstrate that the procedure protects the plaintiff's interests.  *Lujan v. Defenders of Wildlife*, 504 U.S. at 573 n.8; *Nat'l Parks Conservation Ass'n. v. Manson*, 414 F.3d 1, 5 (D.C. Cir. 2005); *Sugar Cane Growers Co-op of Florida v. Veneman*, 289 F.3d 89, 94–95 (D.C. Cir. 2002) ("A plaintiff who alleges a deprivation of a procedural protection to which he is entitled never has to prove that if he had received the procedure the substantive result would have been altered.  All that is necessary is to show that the procedural step was connected to the substantive result.").

Here, the Administrator's continuing failure to grant or deny the Petitions deprives Sierra Club and its members of the benefits of favorable decisions on the Petitions or, in the alternative, of their procedural right to judicially challenge unfavorable decisions by EPA.  Further, the Administrator's failure to respond to the Petitions creates uncertainty for Sierra Club members as to whether they are exposed to excess air pollution because, absent permit limits specifically tailored to ensure downwind concentrations of sulfur dioxide will not exceed the relevant air quality standard, those members cannot be sure the air they breathe is safe.

The negative health effects associated with exposure to sulfur dioxide are well documented.  As discussed above, EPA has determined that exposure to sulfur dioxide for even very short periods of time causes adverse respiratory health effects.  *See* 75 Fed. Reg. at 35,525.  Indeed, there is a very tight correlation between exposure to sulfur dioxide and asthma, and short-term sulfur dioxide exposure is linked to increased visits to emergency departments and hospital admissions—particularly, in at-risk populations including children, the elderly, and asthmatics. 75 Fed. Reg. at 35,525–26.  Thus, the many North Carolinians and neighboring Virginias, including Sierra Club members, who live and recreate in the areas of sulfur dioxide pollution impact caused by Duke's coal plants have good reason to be concerned.

Sierra Club members who live, work, recreate, and carry out other activities in areas where they are exposed to harmful air pollutants emitted from the Asheville and Roxboro Plants suffer cognizable health, recreational, and other injuries as a result of such pollution.  *See Hunt v. Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977); *see also Friends of the Earth*, 528 U.S. at 183.  For example, Sierra Club member Drew Kitt and his family live approximately a mile and a half from Duke Energy's Asheville Plant, and Mr. Kitt is concerned with the health impacts associated with exposure to the Plant's sulfur dioxide pollution.  *See* Declaration of

Andrew R. Kitt ("Kitt Decl.") ¶¶ 6–8.  Mr. Kitt chose to raise his young children in the Asheville area because of opportunities for connection to the natural environment.  *Id.* ¶ 3.  While the Kitt family enjoys hiking and spending time outdoors near their home, *id.* ¶ 4, Mr. Kitt is deeply concerned about the sulfur dioxide pollution emitted from the Asheville Plant.  *Id.* ¶¶ 6–8. Without a numerical permit limit on the emission of sulfur dioxide stringent enough to ensure that air quality near his home will not be adversely impacted by the Plant's operations, Mr. Kitt has no assurance that the air he and his family breathe is safe or that his family's time outdoors will not negatively impact their health.  *See id.* ¶¶ 9–10.

Similarly, Sierra Club member Anne Rexrode, who lives approximately nine miles downwind of the Roxboro Plant, is concerned with the health impacts associated with exposure to sulfur dioxide pollution caused by that Plant.  *See* Declaration of Anne Rexrode ("Rexrode Decl.") ¶¶ 2, 6–9.  Mrs. Rexrode, who chose to live in the area "because of the rural landscape and access to natural beauty" and in light of the fact that "[t]he region's natural resources . . . contribute immensely to [her] quality of life," especially values the opportunities for outdoor recreation.  *Id.* ¶¶ 3–4.  Because of the close proximity of her home to the Roxboro Plant, Mrs. Rexrode, who enjoys hiking in the mountains near her home and kayaking on nearby waterbodies, and who travels past the Plant for shopping and other activities, has concerns as to whether emissions from the Plant are causing unsafe sulfur dioxide pollution in areas she and her husband frequent.  *Id.* ¶¶ 4, 7–9.  Without a numerical permit limit on the emission of sulfur dioxide stringent enough to ensure that downwind ambient air quality will not be adversely impacted by the Plant's operations, Mrs. Rexrode has no assurance that the air she breathes on a daily basis is safe or that spending time being active outdoors and even running daily errands will not negatively impact her health.  *See id.* ¶¶ 4, 8, 9, 12–13.

If Sierra Club prevails in the present action, and EPA acts on the Petitions, Sierra Club members like Mr. Kitt and Mrs. Rexrode will benefit.  If EPA grants the Petitions, revised permits will result in cleaner air; if EPA denies the Petitions, Sierra Club and its members will be able to move forward with challenges to such denials that could ultimately lead to decreased air pollution.  Kitt Decl. ¶ 10; Rexrode Decl. ¶ 13; *see also* Declaration of David Rodgers ("Rogers Decl.") ¶¶ 7–10 (noting the concerns of Sierra Club members regarding air pollution from the Asheville and Roxboro Plants); *see also* Declaration of Huda Fashho ("Fashho Decl.") ¶ 5 (noting that Sierra Club has more than 15,995 members in North Carolina, including many members with a strong interest in preserving or improving the air quality of their State).  For the reasons explained above, standing is established here.  *See United States v. SCRAP*, 412 U.S. 669, 689–90 & n. 14 (1973) ("[A]n identifiable trifle is enough for standing to fight out a question of principle"); *Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*, 75 F. Supp. 3d 387, 415–16 (D.D.C. 2014) (individual has standing where harm to the environment affects the recreational or even the mere aesthetic interests of the plaintiff); *Sierra Club v. Franklin Cnty. Power*, 546 F.3d 918 (7th Cir. 2008) ("likely exposure" to pollution from coal plant during biannual visits to site three miles away sufficient to establish injury in fact); *LaFleur v. Whitman*, 300 F.3d 256 (2nd Cir. 2002) (plaintiff who "has no choice but to breathe the air . . . that will undoubtedly contain increased levels of $SO_2$" from pollution source established injury in fact); *Natural Res. Def. Council v. Illinois Power Res.*, --- F. Supp. 3d ----, 2016 WL 4468552 at *7 (C.D. Ill. Aug. 23, 2016) ("A fear need not be based on medical or scientific evidence of probable consequences in order to be reasonable . . . .  The relevant question is not whether pollutants are present in such a high concentration that they will assuredly cause health problems.  Rather, it is whether pollutants that can be attributed to

17

Defendant could cause harm and are present in the geographic area in which the standing witness has an interest."); *Concerned Citizens Around Murphy v. Murphy Oil USA, Inc.*, 686 F. Supp. 2d 663, 671 (E.D. La. 2010) (plaintiff group's members "demonstrate a cognizable injury by showing that breathing, smelling and being reasonably concerned about the health effects of polluted air diminish their use and enjoyment of their property"); *St. Bernard Citizens for Envtl. Quality, Inc. v. Chalmette Ref.*, 354 F. Supp. 2d 697, 702 (E.D. La. 2005) ("plaintiffs can demonstrate a cognizable injury by showing that they breathe and smell polluted air").

The harms suffered by Sierra Club's members are germane to the Club's mission, which is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. *See* Rodgers Decl. ¶ 4. Adjudication of this challenge to EPA's violation of its statutory duty does not require the participation of individual Sierra Club members. Accordingly, Sierra Club has standing to bring this lawsuit on behalf of its members. *See Friends of the Earth*, 528 U.S. at 181.

## STANDARD OF REVIEW

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Maydak v. United States*, 630 F.3d 166, 182–83 (D.C. Cir. 2010). Once the moving party has satisfied its burden, it is entitled to summary judgment if the non-moving party fails to cite "specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324; Fed. R. Civ. P. 56(c)(1)(A). As set forth below, Sierra Club is entitled to judgment as a matter of law based on material facts that are not genuinely disputed.

**ARGUMENT**

**I.      This Court Has Jurisdiction to Compel EPA to Comply with the Clean Air Act.**

EPA's failure to respond to the Petitions within the sixty-day period mandated by the

Clean Air Act constitutes a failure "to perform an act or duty under this chapter which is not

discretionary with the Administrator" within the meaning of 42 U.S.C. § 7604(a)(2), which

authorizes citizens to commence an action against the Administrator for such failure.  The Clean

Air Act provides that district courts have jurisdiction "to order the Administrator to perform such

act or duty."  42 U.S.C. § 7604(a).  Sierra Club requests that the Court find accordingly and

order EPA to grant or deny the Petitions.

**II.     EPA Violated the Clean Air Act by Failing to Discharge its Non-Discretionary Duty
         to Grant or Deny Sierra Club's Petitions within Sixty Days of their Submission.**

Summary judgment for Sierra Club is warranted because EPA had a non-discretionary

duty under the Clean Air Act to grant or deny Sierra Club's Petitions within sixty days of their

filing and because there is no dispute that EPA failed to carry out that duty.

The Clean Air Act requires that the Administrator, upon receipt of a petition to object to a

permit issued under Title V, "*shall* grant or deny such petition *within 60 days* after the petition is

filed."  42 U.S.C. § 7661d(b)(2) (emphasis added).  The inclusion of an express deadline makes

the statutory duty non-discretionary.  *Envtl. Def. v. Leavitt*, 329 F. Supp. 2d. 55, 64 (D.D.C.

2004) ("Express deadlines in the [Clean Air Act] typically create nondiscretionary duties to

act.").  Therefore, because the Clean Air Act requires the Administrator to carry out her

responsibilities under 42 U.S.C. § 7661d(b)(2) within an explicit time frame, the Administrator's

duty to act is non-discretionary.

There can be no dispute that EPA has neither granted nor denied either Petition.  In fact,

the Agency has not responded in any manner to the Petitions despite the fact that the deadline to

do so expired more than two months ago.  Sierra Club filed the Asheville Petition on June 17, 2016 and the Roxboro Petition on June 23, 2016; therefore, responses from EPA were required by August 16, 2016 and August 22, 2016, respectively.  *See* 42 U.S.C. § 7661d(b)(2).  Sierra Club provided EPA with notice of its intent to sue to compel action on the Petitions on August 25, 2016, more than 60 days ago.  Amirpashaie Decl. ¶¶ 2–3, Exs. 1, 2.

The Administrator's failure to grant or deny Sierra Club's Petitions thwarts the Clean Air Act's goal of protecting public health from harmful air pollution and represents a fundamental breakdown in the delegated authority framework under the Act.  The Administrator's duty to object to Title V permits that lack the conditions necessary to assure compliance by pollution sources with all applicable requirements is a critical element of the Clean Air Act.  Because it is indisputable that the Administrator failed to grant or deny either the Asheville Petition or the Roxboro Petition by the statutory sixty-day deadline, Sierra Club is entitled to summary judgment.

## III.   An Order Compelling EPA to Grant or Deny the Petitions within Thirty Days Is Warranted.

Where an agency has violated a non-discretionary, statutory deadline, an order compelling that agency to satisfy its obligations as expeditiously as possible and by a date certain is warranted.  *See Natural Res. Def. Council v. Ruckelshaus*, 1984 WL 6092, at *3 (D.D.C. 1987) (finding, in the face of agency failure to satisfy a non-discretionary duty, that "it is entirely within the court's power to grant summary judgment for plaintiff . . . and to fashion a schedule requiring compliance with the Act."); *see also* 42 U.S.C. § 7604(a) (providing district courts with jurisdiction to "order the Administrator to perform" a non-discretionary duty).  Here, such an order is necessary and especially appropriate since EPA has already had nearly half a year to respond to Sierra Club's Petitions, yet has failed to take any action.  In the meantime, the people

living in the communities near the Asheville and Roxboro Plants are exposed to unsafe levels of pollution.  Such recalcitrance in the face of an immediate public health threat cannot be countenanced.

Moreover, as discussed above, all that EPA must do in order to respond to Sierra Club's Petitions is render a decision on a straightforward question of law.  No factual investigation or analysis is required.  The Petitions seek a simple determination by EPA about what the Clean Air Act and state applicable requirements require—a determination very similar, if not identical, to the one EPA made two years ago with respect to the petition to object to the Title V permit for the New Hampshire plant.

EPA's failure to respond to the Petitions represents a culture of inaction that has become all too customary within the agency.[3]  A response to Sierra Club's Petitions is neither infeasible nor impossible,[4] and courts "turn a skeptical eye towards agency claims that competing regulatory priorities preclude compliance with statutorily-mandated deadlines" because "accept[ing] such an argument in the face of a congressional direction 'would effectively amount to condoning a fully discretionary approach to a nondiscretionary duty.'"  *Sierra Club v. Johnson*, 444 F. Supp. 2d 46, 54 (D.D.C. 2006) (internal citations omitted).  Indeed, where, as here, EPA has been delinquent in its efforts to comply with governing statutory deadlines, any

---

[3] For instance, in a recent report to Congress, the U.S. Commission on Civil Rights found that "[t]he EPA has a history of being unable to meet its regulatory deadlines and experiences extreme delays in responding to Title VI complaints in the area of environmental justice."  U.S. Commission on Civil Rights, *Environmental Justice: Examining the Environmental Protection Agency's Compliance and Enforcement of Title VI and Executive Order 12,898* (Sept. 2016), *available at* http://www.usccr.gov/pubs/Statutory_Enforcement_Report2016.pdf.

[4] *See Ruckelshaus*, 1984 WL 6092 at *3 ("[T]he agency, not the complaining party, bears the burden of demonstrating the existence of an impossibility.  Courts must 'scrutinize such claims carefully,' since '[t]he agency's burden in such case is especially heavy.'") (internal citations omitted).

"justifications for seeking additional delay cannot override the clear intent of Congress (as expressed in the statute) that these duties should be fulfilled by a date certain." *Id.* at 58; *see also State of New York v. Gorsuch*, 554 F. Supp. 1060, 1065–66 (S.D.N.Y. 1983) (refusing to grant the Administrator "unbridled discretion to administer the Clean Air Act according to her own time schedule" in light of "specific congressional directions to the contrary").

Further, any attempt by EPA to show that it has made a good faith effort to comply with the sixty-day deadline here would ring quite hollow given EPA's chronic pattern of ignoring the Clean Air Act's mandatory deadline to respond to petitions to object.  According to EPA's online database of Title V petitions, the Administrator has responded to only sixteen of the first fifty petitions to object listed.  *See* U.S. EPA, Title V Petition Database, https://www.epa.gov/title-v-operating-permits/title-v-petition-database (last visited Nov. 1, 2016).  And, of those sixteen—a number of which were addressed by EPA only after legal action—not a single response was finalized within sixty days of a petition's filing.  *Id.*  The promptest response came eleven months after petition submittal and the latest, more than three years after.  *Id.*  The families living downwind of the Asheville and Roxboro Plants have waited far too long for clean air and cannot afford to be held hostage to EPA's dawdling any longer.  In order to combat EPA's modus operandi of delay, an order compelling the Administrator to grant or deny the Petitions within thirty days of the Court's ruling on Sierra Club's motion is necessary.

## CONCLUSION

For the foregoing reasons, Sierra Club respectfully requests the Court to expedite its consideration of this motion for summary judgment, to grant the motion, and to declare the Administrator in violation of the Clean Air Act for failing to fulfill her non-discretionary duty of granting or denying Sierra Club's Petitions to object to issuance of the proposed Title V operating permits for the Asheville and Roxboro Plants.  Further, Sierra Club requests that the

Court order the Administrator to perform her duty within thirty days of the Court's ruling on this motion.

Respectfully submitted this 9th day of December 2016,

                                     **_/s/ Kathryn M. Amirpashaie_**
                                     KATHRYN M. AMIRPASHAIE
                                     DC Bar Id. No. 1001491
                                     Law Office of Kathryn M. Amirpashaie, PLC
                                     406 Blue Ridge Avenue NE
                                     Leesburg, VA 20176
                                     703-771-8394
                                     kmalawoffice@gmail.com

                                     *Counsel for Plaintiff Sierra Club*